**AFFIRM; and Opinion Filed January 21, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01354-CR

### LAURA DELACRUZ, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F08-24680-U**

## OPINION

Before Justices Francis, Lang-Miers, and Fillmore
Opinion by Justice Fillmore

A jury convicted Laura Delacruz (Laura) of murder and sentenced her to thirty years' confinement. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). In two issues, Laura asserts (1) the jury's rejection of her insanity defense was so against the great weight and preponderance of the evidence as to be manifestly unjust, and (2) the trial court erred by not permitting her to introduce evidence supporting her insanity defense. We affirm the trial court's judgment.

## Background

Marilyn Delacruz (Marilyn) died from gunshot wounds, and her daughter, Laura, was indicted for Marilyn's murder. Laura pleaded not guilty and raised the affirmative defense of

insanity. A jury found Laura guilty of murder and sentenced her to thirty years' imprisonment. Laura appeals her conviction.

## Sufficiency of the Evidence

Laura contends she was insane at the time of the offense. In her first issue, Laura asserts the jury's rejection of her insanity defense was against the great weight and preponderance of the evidence.

### *Standard of Review*

In the factual-sufficiency review of a rejected affirmative defense, "the defendant is asserting that, considering the entire body of evidence, the jury's adverse finding on [her] affirmative defense was so 'against the great weight and preponderance' of that evidence to be manifestly unjust." *Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013) (quoting *Meraz v. State*, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990)).[1] In a factual-sufficiency review of a rejected affirmative defense, we review the entirety of the evidence in a neutral light, but we may not usurp the function of the jury by substituting our judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony. *Id.*; *see also Meraz*, 785 S.W.2d at 154.[2] Whether the affirmative defense of insanity at the time of an offense excuses criminal responsibility lies in the province of the jury, not only as to the credibility of the witnesses and weight of evidence, but also as to the limits of the defense itself. *Graham v. State*, 566 S.W.2d 941, 952 (Tex. Crim. App. 1978); s*ee also* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979). An appellate court may sustain a defendant's factual-sufficiency claim "only if, after setting out the relevant evidence and explaining precisely how the contrary evidence

---

[1] Appellant's claim is not technically one of factual insufficiency. *Matlock*, 392 S.W.3d at 670 n.29. "[S]he is really arguing that[she] had offered so much evidence in support of [her] affirmative-defense claim and the State offered so little evidence rebutting [her] defense, that the jury's rejection of [her] affirmative defense is against the great weight and preponderance of the evidence." *Id.*

[2] *See also Gillam v. State*, No. 05-11-01334-CR, 2013 WL 1628386, at *13 (Tex. App.—Dallas Apr. 16, 2013, pet. ref'd) (not designated for publication).

greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Matlock*, 392 S.W.3d at 671.

*Applicable Law*

The affirmative defense of insanity excuses a defendant from criminal responsibility even though the State has proven every element of the offense beyond a reasonable doubt. *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008). A defendant is presumed to be sane and presumed to have intended the natural consequences of her actions. *Id*. at 591. A defendant asserting an insanity defense has the burden to prove by a preponderance of the evidence that at the time of the conduct charged, "as a result of severe mental disease or defect," she did not know her conduct was wrong. *See* TEX. PENAL CODE ANN. §§ 2.04(d) (West 2011) (if issue of existence of an affirmative defense is submitted to the jury, the court shall charge that defendant must prove the affirmative defense by a preponderance of evidence); 8.01(a) (West 2011); *Ruffin*, 270 S.W.3d at 592. In the context of an insanity defense, conduct is "wrong" if it is "illegal." *Ruffin*, 270 S.W.3d at 592. If a defendant knows society considers her conduct illegal, she understands the conduct is "wrong" and she is not insane, even though she may think due to her mental condition that the conduct is morally justified. *Id*. Expert testimony, even if uncontradicted, does not establish insanity as a matter of law. *Brooks v. State*, 719 S.W.2d 259, 262 (Tex. App.—Waco 1986, pet. ref'd). While expert testimony may be helpful to a jury, the issue of insanity is not strictly medical; the ultimate issue of criminal responsibility is beyond the province of medical experts and must be left to the discretion of the trier of fact. *Graham*, 566 S.W.2d at 949. The circumstances of the offense, the life experiences of the accused, and her actions before and after the crime are relevant in determining sanity at the time of the offense. *Ross v. State*, 153 Tex. Cr. 312, 220 S.W.2d 137, 139 (1949).

*Evidence*

At about 4:30 p.m. on June 28, 2008, Laura, who was twenty-six years of age, shot Marilyn four times. The medical examiner testified that three of the four gunshot wounds were potentially lethal. The cause of Marilyn's death was multiple gunshot wounds and the manner of her death was homicide.

The jury heard testimony regarding Laura's purchase on June 28, 2008 of the handgun used to shoot Marilyn. Shortly after Academy Sports & Outdoors in Mesquite, Texas, opened, Laura approached employee Don Seeger about purchasing a gun. Seeger testified that something with regard to her overall demeanor "gave him pause." She was nervous and anxious, and she did not make eye contact with him. She was evasive in responding to his questions and was not able to tell him how she wanted to use the gun. Laura did not express a preference for a type of gun, she "just want[ed] a gun." Because he had concerns about selling a gun to Laura, Seeger asked another store employee, Paul Singleton, to come to the counter to speak with her.

Singleton testified Laura was well dressed and groomed, was not disheveled, and did not appear intoxicated. Singleton testified he engaged Laura in conversation, asking her what caliber and type of gun she wished to purchase and how she intended to use the gun. Laura did not make eye contact when he spoke to her. Laura appeared coherent, although she gave vague and unsatisfactory answers to his questions. She said she did not know why she wanted to purchase a gun, which was a "red flag" to Singleton. He decided not to sell her a firearm because he thought she might commit suicide. Singleton emailed other Academy Sports & Outdoors stores in the area, including stores on Forest Lane in Dallas and in Plano, advising not to sell Laura a gun. Shortly after his interaction with Laura at the Mesquite store, Singleton spoke with an employee at the gun counter of the Forest Lane store who indicated Laura was at that store.

Jack Hall, an employee of the Academy Sports & Outdoors store located on Forest Lane, testified he received a telephone call from an employee of the Mesquite store, advising a female customer was not permitted to purchase a firearm at that location because she was acting strangely and the employee did not feel comfortable selling her a gun. Later that day, Laura came to the Forest Lane store and advised Hall and Paul Sanchez, another employee at that store, that she wanted to buy a weapon. According to Hall, Laura acted strangely and appeared troubled, paced back and forth, would not make eye contact with anyone, and was either wringing her hands or holding her head in her hands. Hall stated he would not have sold her a weapon.

According to Sanchez, Laura appropriately engaged in conversation with him. She was coherent in responding to his questions, but she was evasive and "not very forthcoming." Laura told Sanchez she wanted one of the firearms appearing in a recent store advertisement. In addition, she stated she wanted to purchase 500 rounds of ammunition. Sanchez told her the store did not sell ammunition in that quantity. Because she did not provide answers that made sense regarding her purpose for purchasing a gun, Sanchez informed Laura he was not comfortable selling her a firearm. Laura asked him if the reason he would not sell her a gun was because she is a girl or was not wearing camouflage. Sanchez explained he would not sell her a firearm due to her uncertainty about the type and caliber of firearm she wanted and her expressed desire to purchase the gun not for her own use but to give to her brother. Sanchez testified that Laura seemed kind of nervous, was "out of it," "not all there," and behaving "bizarrely." He stated he did not intend the "out of it" and "not all there" descriptions to be taken as a comment on Laura's mental health, and he did not form any judgment as to her mental health. Laura did not seem to be hearing or responding to voices that were not there. She did not act in a way that made Sanchez believe she was experiencing hallucinations. He described her as appearing not

comfortable being there. He worried she was going to make a scene, indicating she was shaking so hard "she was coming out of her shirt."

When Laura left the Forest Lane store, she gave the impression to Hall she was going to another Academy Sports & Outdoors store. Hall called two Academy Sports & Outdoors stores in Plano, Texas, and provided information to them regarding Laura's physical description, name, and driver's license number. Hall advised employees of the Plano stores that Laura had been denied purchase of a firearm at both the Mesquite and Forest Lane stores that day. Nevertheless, at approximately 1:30 p.m. that day, Laura purchased the gun used to shoot Marilyn at an Academy Sports & Outdoors store in Plano.

Laura's father, Miguel Martinez Delacruz (Miguel), testified regarding the shooting. According to Miguel, when he arrived at the home in Garland, Texas, where he, Marilyn, and Laura lived, Laura saw him drive up and slammed the front door. After Miguel came inside the home, Laura asked him to leave and go to a store to buy her a candy bar. Miguel asked Marilyn to go with him to get Laura a candy bar after he took a shower. Miguel stated he invited Marilyn to accompany him because he did not want to leave Marilyn alone with Laura. Miguel testified Laura seemed aware of "what was going on." He believes that Laura asked him to leave and go to a store to buy her a candy bar in order to get him out of the house so she could kill Marilyn. After taking his shower, Miguel found the front door of the home ajar and Marilyn lying lifeless on the front porch. When he saw Laura, she said, "I want to kill myself." As Miguel was calling 9-1-1 to report the incident and request assistance, Laura said she was going to kill herself.

D.C. Jackson, an officer with the City of Garland Police Department, received a dispatch to the address of the Delacruz home. Jackson was told a female had shot her mother and was trying to kill herself. Upon arriving at the scene and coming in contact with Laura, she was told to put her hands up, which she did. Laura was placed in handcuffs, escorted out of the home,

and placed under arrest. Laura did not resist police officers, did not question why police officers were at the home, and seemed to understand why officers were there and were placing her in handcuffs. Jackson testified Laura wanted to know if Marilyn was dead. According to Jackson, Laura did not appear regretful or remorseful, and she did not appear to be responding to voices in her head.

William Ellstrom, a detective with the City of Garland Police Department, interviewed Laura. The videotape of that interview was played for the jury. When asked whether she knew what happened, Laura stated she shot and killed somebody. Later during that interview, Laura said, "I shot my Mom," "I killed her." Laura said she used a gun that was pink.[3] When asked her purpose in buying the gun earlier that day, she said she "just bought it." She stated that she attempted to purchase the gun at a store in Mesquite, but the sales clerk said she did not look stable and would not sell her a gun. She then went to a second store to purchase a gun. The sales clerk asked if the gun was for self-defense, to which she responded it was for her husband or boyfriend. The clerk said he would not sell her a gun for someone else. Laura then described going to a third store where she purchased the gun and ammunition with a credit card.

Laura told Ellstrom she hid the gun she had purchased under a hamper in the garage. She asked Miguel to go buy her a candy bar because she did not want him "to see all the commotion." While her father was in the shower, she shot Marilyn. Laura stated to Ellstrom that killing her mother was the wrong decision. In the statement Laura wrote that night in conjunction with Ellstrom's interview of her, Laura wrote, "That was a big mistake. I'm gonna pay for it. . . . I am so mad and disappointed with myself for killing my own guardian." Laura told Ellstrom that after she shot her mother, she wanted to kill herself. She indicated she thought of killing herself in her jail cell but did not see anything in her cell she could use to hang herself.

---

[3] The Academy Sports & Outdoors receipt for the purchase of the gun indicates it is a "Rossi pink .38."

Laura told Ellstrom she had been diagnosed with schizophrenia five years prior to the offense, and she was experiencing "some of that" today. She stated she was not mentally ill.

Considerable evidence was introduced regarding Laura's history of mental illness and the mental disorder that preexisted the offense. Miguel testified that at the age of sixteen, Laura began having psychiatric issues. He learned Laura "had schizophrenia" when she was eighteen years old. Laura had been seen at several psychiatric treatment facilities when her problems "got worse," including instances of hallucinating, "talking silly," "talking to people who weren't there," "or just coming up with nonsense." Miguel said Laura would talk about the Holocaust and Hitler killing Jews.

Miguel testified that Laura was on disability, and Marilyn was appointed her guardian and received disability checks on her behalf. Laura would become upset with Marilyn and they would argue. Marilyn would "nag" Laura about being lazy and sleeping all day. Laura became angry when Marilyn would not allow Laura to borrow her car. According to Miguel, Marilyn was afraid of Laura's behavior and her mental illness. Miguel testified he and Marilyn would avoid doing things to upset Laura, but on occasion Marilyn would raise her voice to Laura. Marilyn told Miguel of arguments she had with Laura in which Laura called her "ugly things." Miguel testified that for several years, he and Marilyn locked their bedroom door at night out of concern regarding Laura's behavior and because he was worried her illness might lead her act violently.

Josephine Matrese, Marilyn's niece, testified that Marilyn was the person in the family most concerned about Laura's mental health. Marilyn took Laura to doctors and hospitals, and she was increasingly nervous and worried about Laura's deterioration. The relationship between Marilyn and Laura was not abnormally hostile.

Laura's older brother, Michael Delacruz (Michael), testified at trial. He learned about Laura "getting sick" in 2005. She did not finish Mesquite High School and had to transfer to another school. Marilyn told Michael about episodes in which Laura would "see things" and about instances of Laura lying. Michael observed Laura would pace back and forth, stay in her room in the dark, and sleep all day and night. She would laugh for no reason and when he asked her what she was laughing at, she would say someone told her something funny when there was no one there. Laura told Michael that Osama Bin Laden, Charles Manson, or a bearded man who looked like Santa Claus was present when there was no one else in the room. She would say things like "the Holocaust was not real" and describe "a conspiracy theory" involving the World Trade Center. Michael said he knew there was something wrong with Laura and doctors had told Marilyn that Laura was schizophrenic and bipolar. Marilyn had done research and told Michael that sometimes persons with schizophrenia killed their family members. He had heard of instances where Laura was naked at a store and was in a hospital emergency room after being observed on a table barking like a dog. Laura had been admitted to four different psychiatric institutions. Marilyn was "doing the mental side" with regard to Laura and was appointed guardian for Laura. Marilyn controlled how much money Laura received from her disability checks.

The jury heard recordings of telephone calls Laura made in 2012 from jail to Miguel and to Stephen Watson, her ex-boyfriend. To Miguel, Laura conveyed she had been told by people that she had a "really good case" for mental illness and that she would probably "do" five more years and go home on probation. She mentioned a woman who had drowned her children and was found not guilty by reason of insanity. Laura discussed wanting to be transferred to another facility because the food was better there and she would be allowed to wear makeup and go outside.

In her calls to Watson, Laura discussed an upcoming evaluation of her sanity at the time of the shooting. Watson told Laura she "deserve[d] the protection" of being found not guilty by reason of insanity and to be certain to communicate to the individual conducting the evaluation that she was not taking her medications and was not in her right mind at the time, and that if she needed to, she should tell of the voices she heard. Watson told Laura she should tell "them" she had benefitted from treatment and realized she had to take her medications.

Laura talked to Watson about wanting to make sure she got some money from Marilyn's life insurance and that Miguel was trying to sue her and take all the money. Laura told Watson that if she was found not guilty by reason of insanity, she would receive about $500,000 from Marilyn's life insurance. Laura also told Watson that she did not want to plea bargain because a consequence of a plea would be that she would not receive any of the insurance proceeds; Laura then indicated that if she was found not guilty by reason of insanity, she would receive $250,000 from Marilyn's life insurance. She stated she would rather spend "another year or two locked up" than not receive any money. Laura told Watson that was their "little secret." He cautioned her that the telephone calls from jail were monitored. Watson told Laura not to talk about receiving money from Marilyn's life insurance because it would be seen as a lack of remorse.

Jack Randall Price, Ph.D., a clinical and forensic psychologist, testified regarding his September 2012 interview of Laura and his opinions regarding her sanity at the time of the shooting. Price's report was admitted in evidence. Records of Laura's psychiatric treatment prior to the offense were also admitted in evidence. Laura had been diagnosed with schizoaffective disorder, a bipolar disorder. It is a category of mental illness that includes some psychosis, is a serious mental disorder, and may involve auditory hallucinations and depressive or manic episodes. Price testified Laura had a severe mental illness at the time of her evaluation and at the time of the offense.

Price considered Laura's behavior prior to, during, and just after the offense to determine whether her mental disorder was active at the time and if so, whether it prevented her from knowing right from wrong. According to Price, Laura's behavior before and at the time of the offense suggested an awareness of wrongdoing. Laura did not assert at the time of the offense that she was unaware that her conduct was wrong. Laura's behavior was goal-oriented and aimed at concealing her intentions. Her purchase of the gun was purposeful, and she went to great lengths to purchase the gun by borrowing a credit card from Marilyn for the feigned purpose of buying clothes and by going to three different stores to accomplish the purchase of the gun. Laura hid the gun she purchased, demonstrating she knew it was wrong to have a gun. She requested that Miguel leave the house and go to the a store to buy her a candy bar, indicating she knew what she was going to do was wrong, and she did not want him to be there to see "all that was going to happen." According to Laura, when her father announced that he was going to take a shower, she thought she could kill her mother without him interfering. In Price's opinion, Laura's behavior after the occurrence, such as attempts to harm herself, trying to leave the scene, her initial response to the police by raising her hands, and her telling the police later that night that what she had done was a mistake and wrong, demonstrate, at least in part, an awareness of the potential consequences of her actions.

In the interview with Price, Laura made statements that at the time she shot her mother, she knew it was wrong and she felt bad about it. Laura told Price that she hoped to be found not guilty by reason of insanity, and she was not in her right mind at the time of the shooting. She said she "was really sick" and she "is mentally ill." She said she heard the voice of "Earl" and he told her to buy a gun. Laura first told Price that she had not heard Earl's voice since shooting her mother, but then said she heard the voice say everything was going to be fine. Price believes

–11–

that the voices telling Laura to kill her mother because she was Jewish was one factor that led to this event.

Laura told Price that Marilyn was sweet and gentle with her. However, Price testified there was enough family conflict for Miguel to tell investigators that he and his wife had been concerned about Laura hurting one of them. Laura told Price that she argued with her mother. The arguments appeared to stem from Marilyn trying to control Laura's behavior. Laura told Price she did not like her mother nagging her about things. She also said she was angry about a fight she and her mother had about a month before Marilyn was shot. Laura told Price that, at some point, she learned Marilyn had changed her will, and Laura was upset about that.

Price had heard the recordings of telephone calls Laura made to Watson. In his opinion, Laura's statements to him in the interview followed closely what Watson had "coached" her to do. In the interview, Laura told Price she had not discussed a defense of legal insanity or Marilyn's estate with anyone. When Price asked her who Watson was and about talking to him on the telephone from jail, Laura became "deflated." She denied Watson advised her about a defense of legal insanity, although she said she had discussed with Watson that she could inherit some money from Marilyn and that her father was suing her for money Marilyn left her.

Price opined that despite suffering from a severe mental disease or disorder at the time of the offense, Laura knew her conduct was wrong. Therefore, in his opinion, Laura did not meet the definition of insanity under Texas law at the time of the offense.

The jury also heard the testimony of Kristi Compton, Ph.D., a clinical and forensic psychologist, regarding her evaluation of whether Laura was legally insane at the time of the offense. Compton's "Mental State of the Offense Evaluation" was also admitted into evidence. Compton testified that in an insanity evaluation, the primary thing to look at is the mental state of the accused at the exact time of the offense, and it is preferable to interview the person shortly

after the offense. Compton interviewed Laura three times in September 2012, four years after the offense. To bridge the gap between the event and the time of the interviews, Compton reviewed the videotaped police interview of Laura the night of the event; Miguel's videotaped statement; the audio recording of Miguel's 9-1-1 telephone call; police narrative and incident reports; affidavits of various employees of Academy Sports & Outdoors; Laura's records from Dallas Regional Hospital, Mesquite Community Hospital, Timberlawn Hospital, Vernon State Hospital, Dallas MetroCare Services, and Parkland Hospital; and evaluations of doctors who had seen Laura in jail. Compton also performed testing to determine if Laura was "malingering" in an attempt to feign mental illness and interviewed Miguel.

According to the records reviewed by Compton, Laura was diagnosed at the age of sixteen with an anxiety disorder and was not in touch with reality, believing she was communicating with a "secret society." At the age of twenty-two, Laura was again experiencing hallucinations, delusions and homicidal ideations, and had been hearing voices in her head for the past four years. Laura was twice admitted to Timberlawn Hospital at the age of twenty-two, the records indicating she was paranoid, delusional, hallucinating, not in touch with reality, and experiencing "command hallucinations" where voices were telling her to kill herself. She was diagnosed with schizophrenic disorder, which can cause psychosis. At twenty-five years of age, Laura attempted suicide by taking over-the-counter pain relievers. At that time, she was having command hallucinations. She was again diagnosed with schizophrenia and sent to a psychiatric treatment facility.

Compton testified that five days before the offense, Laura went to MetroCare Services requesting medications. She had not been seen by health care providers for approximately three months at that time. At MetroCare Services, Laura was prescribed antipsychotic and antidepressant medications. According to the police offense report, medications were found

–13–

among Laura's property and in the medicine cabinet of the home. Some of the medications appeared to have been taken, but the number of pills missing did not equal the number of pills that should have been taken in the intervening five-day period.

According to medical records reviewed by Compton that were generated a week and one-half after Marilyn was shot, Laura was diagnosed with schizoaffective disorder of a bipolar type. The records indicate Laura was paranoid, "grandiose," and having hallucinations telling her to kill herself. On July 12, 2008, she was noted to be psychotic and to have stated, "I shot my mother. I didn't mean to do it." Laura reported hearing voices that told her to get a gun and shoot her mother and a man's voice telling her to hurt herself and do bad things. Records of August 26, 2008 indicate Laura was in a manic state. In March 2009, Laura was sent to Vernon Hospital, the State psychiatric hospital.

According to Compton, Laura reported to doctors on August 20, 2009 that she was hearing voices of Osama Bin Laden and God, felt she was linked to terrorist attacks and other catastropes, the Holocaust, and Michael Jackson's death. Laura described the voice of an older man she referred to as Earl, Henry, or Ford, and the voice was accusing her mother of being too Jewish, threatening to do brain surgery on Laura, and telling Laura to kill herself. Laura told Compton that she knew killing her mother was wrong, but she had no choice because "Earl wanted it done."

During Compton's interview of Miguel, he told her of instances where Laura locked herself in an armoire for hours and of her not sleeping or keeping up with proper grooming. Miguel told Compton Marilyn had increased the amount of her life insurance before her death, but he could not provide Compton evidence that Laura shot her mother to recover proceeds from that life insurance policy.

In her report, Compton stated, "A person has a mental disease or defect in mental impairment when severe enough to prevent one from fully understanding their conduct was wrong." Compton testified that her standard for a determination of insanity is the same as the legal standard. Compton testified her focus was on determining whether, at the time Laura purchased the gun and shot her mother four times, she understood that her conduct was wrong or whether hallucinations and delusions were driving her behavior and she acted at the behest of the hallucinations and delusions. Compton stated that some people can be influenced by delusions, yet know their behavior is wrong and have the capacity to resist, which is why it is important to look at the person's behavior at the time of the offense.

It was Compton's opinion Laura was suffering from hallucinations and the effects of recreational drugs at the time of the offense, and that is what precipitated the shooting. Based on Laura's history and statements she made in close proximity to the offense, Compton came to the conclusion that Laura did not have the mental capacity at that time to fully appreciate or understand her behavior was wrong and that she was legally insane at the time of the offense. Compton acknowledged that initially she did not think Laura was going to meet the criteria for legal insanity, because Laura did not disclose any psychosis to police officers. Instead, Laura exhibited a "flat affect" and referred to Marilyn as "the victim" and "guardian," and in the recording of Miguel's 9-1-1 telephone call, Laura can be heard in the background calmly stating, "I got to go. I got to kill myself now." However, after reviewing Laura's medical records and talking to her, Compton concluded Laura was not in her right mind at the time of the offense and was experiencing a command hallucination to kill her mother and then kill herself. Although in the police interview, Laura said "I have a mental condition, but I'm not mentally ill," Compton thought Laura had a "big gap" in understanding she had a severe mental illness. Compton acknowledged there were no references in the medical records to "voices" telling Laura to kill

–15–

her mother until after Marilyn was dead. Compton believed that at the time Laura shot Marilyn, her mental state was similar to the active psychotic state experienced at the time she attempted suicide in 2007. Compton further believed that if Miguel had not stopped her, Laura would have killed herself after shooting Marilyn.

Compton testified it could be asserted Laura planned to shoot Marilyn in that she went to three different stores in an attempt to purchase a gun. Compton acknowledged that the fact that Laura asked her father to leave the home to buy her a candy bar immediately prior to the offense was evidence she knew what she was doing was wrong, as was hiding the gun in the hamper in the garage. Although there had been arguments between Laura and Marilyn in the past and Compton knew Laura had stated her mother changed her will a few days before the shooting, Compton opined that there appeared to be no motive of revenge, greed, or anger, and no "solid evidence" Laura shot her mother for monetary gain.

*Analysis*

Viewing the evidence in a neutral light, the record reflects the jury heard evidence that Laura had a long history of mental illness and had been diagnosed with schizophrenia and a bipolar disorder. She had been hospitalized several times due to her mental illness. She went to MetroCare Services five days before the shooting and was prescribed antipsychotic and antidepressant medications.

The record reflects the jury also heard conflicting opinions with regard to whether Laura was legally insane at the time of the shooting. *See Graham*, 566 S.W.2d at 948 (individual may be medically insane from mental disease or defect, yet legally she is not relieved of criminal responsibility for the crime unless her mental condition reached the point where she was unable to distinguish right from wrong). While Compton testified concerning her opinion that Laura did not have the capacity to fully appreciate or understand her conduct was wrong and was legally

–16–

insane at the time of the shooting, Price testified it was his opinion Laura did understand that her conduct was wrong and was not legally insane at the time of the shooting.

The jury viewed video of the police interview conducted hours after the shooting, in which Laura stated what she had done was wrong. Laura's written statement was also introduced into evidence in which she wrote that she made a mistake and was going to pay for it. There was other evidence from which the jury could have concluded Laura knew shooting her mother was wrong. The evidence demonstrated Laura's efforts in shopping at three different stores in order to purchase the gun used to shoot her mother were purposeful, goal-oriented, and required planning. She concealed her purpose for purchasing the gun from the personnel at each of those stores. The jury heard testimony that Laura hid the gun in or under the hamper in the garage, as well as testimony Laura asked Miguel to leave the house to buy her a candy bar so that he would not be home when the shooting occurred. Laura raised her arms when the police arrived, and she appeared to understand why the police were there. The jury could have inferred that Laura's statements that she was going to kill herself after shooting her mother were indicative she knew what she had done was wrong.

The jury also heard testimony that Laura was angry with her mother about an argument between the two of them. There was further testimony regarding Laura's displeasure in Marilyn changing her will and that Marilyn had increased her life insurance prior to the shooting. The jury also heard portions of Laura's telephone calls from jail in which she discussed her desire to be found not guilty by reason of insanity and her belief that she would be released after several years and would collect proceeds from Marilyn's life insurance policy. From the evidence, the jury could have inferred a potential motive for Laura shooting Marilyn and a plan for Laura's assertion of a defense of not guilty by reason of insanity.

The jury was able to make its own determination as to Laura's state of mind at the time of the shooting and whether she knew her conduct was wrong. The issue of insanity at the time of the offense lies in the province of the jury not only with regard to the credibility of the witnesses and the weight of the evidence, but also as to the limits of the defense itself. *See Graham*, 566 S.W.2d at 952.[4]

*Conclusion*

On this record, evidence was presented that Laura suffered from mental illness at the time of the offense and conflicting evidence, including expert opinions, concerning whether Laura was legally insane at the time. The ultimate determination of whether Laura was insane at the time of the offense was for the jury. *See Reyna v. State*, 116 S.W.3d at 367. By returning a verdict of guilty, the jury necessarily determined Laura understood her conduct was wrong and was legally sane at the time of the shooting. We conclude a rational trier of fact could have resolved the evidence regarding legal insanity against Laura. The evidence that Laura was not legally insane at the time of the shooting and supporting the jury's rejection of the insanity defense was not so against the great weight and preponderance of the evidence that it was "manifestly unjust," "conscience-shocking," or "clearly biased." *See Matlock*, 392 S.W.3d at 671. Accordingly, we resolve Laura's first issue against her.

**Exclusion of Evidence**

In her second issue, Laura contends the trial court erred in excluding evidence regarding competency evaluations performed by Dr. Michael Pittman and Dr. Lisa Clayton between the time of her arrest and her trial. According to Laura, the competency evaluations were favorable to her affirmative defense of insanity, and exclusion of the evidence was harmful error.

---

[4] *See also Boan v. State*, Nos. 05-11-01702-CR & 05-11-01703-CR, 2013 WL 3956375, at *3 (Tex. App.—Dallas, July 30, 2013, no pet.) (not designated for publication).

–18–

The record shows the State objected to the admission of evidence of the competency evaluations performed by Pittman and Clayton, and the trial court excluded the evidence for lack of relevance to Laura's affirmative defense of insanity and because of the untimely designation of the expert witnesses by the defense. Responding to Laura's argument on appeal, the State asserts Laura has failed to address, as an independent basis for the trial court's exclusion of the testimony of Pittman and Clayton regarding their competency evaluations, the untimely designation of those experts and has therefore waived this complaint. In further response to Laura's second issue, the State asserts, alternatively, that the trial court did not abuse its discretion in exclusion of the evidence of the competency evaluations and error, if any, in exclusion of the evidence was not harmful.

*Standard of Review*

We review a trial court's decision to admit or exclude evidence, including a trial court's decision to exclude the testimony of an expert, under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *see also Osbourn v. State*, 59 S.W.3d 809, 814 (Tex. App.—Austin 2001), *aff'd*, 92 S.W.3d 531 (Tex. Crim. App. 2002). The trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles. *Lyles v. State*, 850 S.W.2d 497, 502 (Tex. Crim. App. 1993). We will uphold the court's decision if it is within the zone of reasonable disagreement. *Weatherred*, 15 S.W.3d 542. And we will uphold the trial court's ruling if it is correct under any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made. *See Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 1998).

*Proffered Evidence*

The defense made an offer of proof indicating what the excluded testimony of Pittman and Clayton would have been. The defense stated Pittman would have testified to the contents of the competency evaluations of Laura he performed on July 24, 2008 and August 29, 2009, and Clayton would have testified to the contents of the competency evaluations of Laura she performed on March 6, 2009 and August 25, 2009. The defense also stated Pittman would have further testified that with regard to the competency evaluation of July 24, 2008, Laura was competent in only the barest of senses, she had been on her medications for two and one-half weeks at that point and her condition was improving, and Laura could have been more mentally ill at the time of the shooting than she presented to Pittman at the time of that evaluation.

*Exclusion Pursuant to Article 39.14(b)*

Prior to trial, the trial court signed an order granting the State's motion for discovery under article 39.14 of the code of criminal procedure, ordering defense counsel to disclose on or before August 30, 2012, "a date which is at least twenty (20) days before the trial is scheduled to begin," the names and addresses of each person Laura and her attorney may use to present evidence under rules of evidence 702, 703, and 705. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14(b) (West 2005)[5]; TEX. R. EVID. 702 (testimony by experts), 703 (bases of opinion testimony by experts), & 705 (disclosure of facts or data underlying expert opinions). On August 27, 2012, the defense designated Compton as an expert witness pursuant to article 39.14(b). On September 20, 2012, two days after trial began, the defense filed an amended

---

[5] Article 39.14(b) provides in pertinent part:

> On motion of a party and on notice to the other parties, the court in which an action is pending may order one or more of the other parties to disclose to the party making the motion the name and address of each person the other party may use at trial to present evidence under Rules 702, 703, and 705, Texas Rules of Evidence.

TEX. CODE CRIM. PROC. ANN. art. 39.14(b).

designation of experts pursuant to article 39.14(b), designating Pittman and Clayton as additional expert witnesses.

The State objected to the designations of Pittman and Clayton as untimely, pointing out that in pretrial hearings, matters dealing with experts were discussed and at no point did the defense indicate Pittman or Clayton were to be called as experts. The State argued that Pittman and Clayton conducted competency evaluations and the State had no reason to anticipate their testimony in advance of their designations as experts because competency was not an issue in the trial.

The trial court agreed the designation of Pittman and Clayton as experts was untimely. Further, the trial court noted multiple competency evaluations had been in the trial court's file for some time and the defense was aware of those evaluations. The trial court noted the defense had the opportunity to timely designate these expert witnesses and noted it "seems like . . . a backdoor way to get into the competency issue" which the trial court had ruled was not relevant to Laura's insanity defense and, therefore, not admissible. *See Johnson v. State*, 233 S.W.3d 109, 115 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (recognizing two factors in determining whether trial court abused its discretion in excluding testimony: bad faith in failure to disclose and opposing party could not have reasonably anticipated the undisclosed witness would testify).[6]

On appeal, Laura fails to challenge this ground for the trial court's exclusion of the testimony of Pittman and Clayton regarding their competency evaluations of Laura. When an appellee objects to evidence on several independent grounds and, on appeal, the appellant fails to challenge all possible grounds for the trial court's ruling, the appellant waives any error by not

---

[6] *See also Wilson v. State*, No. 05-10-01604-CR, 2012 WL 3264396, at *10 (Tex. App.—Dallas Aug. 13, 2012, pet. ref'd) (not designated for publication); *Strawn v. State*, No. 02-02-00170-CR, 2003 WL 21235537, at *2–4 (Tex. App.—Fort Worth May 29, 2003, pet. ref'd) (not designated for publication).

challenging all possible grounds for the trial court's ruling. *See Marsh v. State*, 343 S.W.3d 158, 161–62 (Tex. App.—Texarkana 2011, pet. ref'd); *Gulley v. Davis*, 321 S.W.3d 213, 218 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). By not challenging all possible grounds for the trial court's exclusion of expert testimony of Pittman and Clayton, Laura has waived this complaint. *See Gulley*, 321 S.W.3d at 219.

*Testimony Not Relevant to Affirmative Defense of Insanity and Exclusion Was Harmless*

Even if Laura's issue is not waived, the exclusion of the expert testimony of Pittman and Clayton was not erroneous because the evidence was not relevant to her affirmative defense and, in any event, exclusion of the evidence was harmless. As to relevance, the trial court ruled the parties were not to discuss, refer or allude to Laura's competency to stand trial because her competency to stand trial, and the evaluations to determine her competency to stand trial, were not evaluations of her sanity at the time of the offense and therefore were not relevant to her affirmative defense of insanity. At trial and on appeal, Laura contends she was entitled to introduce evidence of competency evaluations pursuant to article 46B.007(2) of the code of criminal procedure. Article 46B.007 provides:

> A statement made by a defendant during an examination or trial on the defendant's incompetency, the testimony of an expert based on that statement, and evidence obtained as a result of that statement may not be admitted in evidence against the defendant in any criminal proceeding, other than at:
> (1) a trial on the defendant's incompetency; or
> (2) any proceeding at which the defendant first introduces into evidence a statement, testimony, or evidence described by this article.

TEX. CODE CRIM. PROC. ANN. art. 46B.007 (West 2006). Laura asserts article 46B.007(2) allowed her to introduce matters regarding her competency to stand trial because they relate to her defense in that competency was relevant to her state of mind nearer the time of the offense and to the continuation and ongoing nature of her mental illness. The State responds that testimony regarding Laura's competency to stand trial was not relevant to her insanity defense.

Neither Pittman nor Clayton evaluated Laura's sanity at the time of the shooting. Rather, Dr. Pittman and Dr. Clayton evaluated Laura to determine, at the respective times of the evaluations they performed, whether Laura was competent to stand trial.

Determination of a person's competency to stand trial is different from a determination of whether a person was legally insane at the time of an offense. *Compare* TEX. CODE CRIM. PROC. ANN. art. 46B.003(a) (West 2006) (person is incompetent to stand trial if the person does not have sufficient present ability to consult with person's lawyer with reasonable degree of rational understanding or a rational and factual understanding of proceedings against the person) *with* TEX. PENAL CODE ANN. § 8.01(a) (it is affirmative defense to prosecution that at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know his conduct was wrong). Accordingly, the expert testimony of Pittman and Clayton relating to their evaluations of Laura's competency to stand trial was not relevant to the question of whether she was legally insane at the time of the offense, and the trial court did not abuse its discretion in excluding the evidence.

As to harm, rule of appellate procedure 44.2(b) provides that any error, other than constitutional error, that does not affect the defendant's substantial rights must be disregarded. Tex. R. App. P. 44.2(b); *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007); *see also Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007) (erroneous evidentiary ruling "generally constitutes non-constitutional error and is reviewed under Rule 44.2(b)"). A substantial right is affected when, after reviewing the record as a whole, a court concludes the error had a substantial and injurious effect or influence on the outcome of the proceeding. *Burnett v. State*, 88 S.W.3d 633, 637 & n.8 (Tex. Crim. App. 2002). In assessing harm, we examine the entire record and "calculate, as much as possible, the probable impact of the error upon the rest of the evidence." *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). We

consider, among other relevant factors, the "testimony or physical evidence admitted for the [fact finder's] consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with the other evidence in the case." *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). The weight of the evidence of the defendant's guilt is also relevant in conducting the harm analysis under rule 44.2(b). *See Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008); *Motilla*, 78 S.W.3d at 357.

The defense timely designated Compton to testify. The trial court ruled Compton could testify regarding the content of records and reports she reviewed, including competency evaluations by Pittman and Clayton, in performing her evaluation of Laura and in forming her opinion of whether Laura was legally insane at the time of the shooting. The limitation on Compton's testimony was that she not refer to competency or to the fact that evaluations by Pittman and Clayton were performed for purposes of determining Laura's competency to stand trial at various times after the offense.

Dr. Compton testified at trial that in performing an insanity evaluation, the primary consideration is the person's mental state at the "exact time of the offense." Compton's insanity evaluation of Laura occurred four years after the shooting. The information Compton reviewed included evaluations of doctors who had seen Laura in jail and in mental hospitals following the shooting, and Compton testified regarding statements Laura made and findings of health care providers following the shooting, although she was not allowed to testify regarding the competency evaluations or that certain statements by Laura may have been made in conjunction with competency evaluations. Because Compton was permitted to testify with regard to statements made by Laura during competency evaluations, we conclude error, if any, in excluding the testimony of Pittman and Clayton did not have a substantial and injurious effect or

–24–

influence in the determination of Laura's guilt or the rejection of her insanity defense by the fact finder. Accordingly, when the record is considered as a whole, we conclude Laura was not harmed by any error in the trial court's exclusion of the evidence. We resolve Laura's second issue against her.

## Conclusion

Having resolved Laura's first and second issues against her, we affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
Tex. R. App. P. 47

121354F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LAURA DE LA CRUZ, Appellant

No. 05-12-01354-CR　　　V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas,
Trial Court Cause No. F08-24680-U.
Opinion delivered by Justice Fillmore, Justices Francis and Lang-Miers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 21st day of January, 2014.

/Robert M. Fillmore/

ROBERT M. FILLMORE
JUSTICE